**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JEFFREY L. SHERK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil No.   13-381-CJP[1] |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Jeffrey L. Sherk is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.   For the reasons set forth below, the Commissioner's decision is reversed and this matter is remanded for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. §  405(g).

## PROCEDURAL HISTORY

Jeffrey Sherk applied for benefits in March 2010 alleging disability due to cerebral palsy (Tr. 134–41).   Sherk's application was denied initially and upon reconsideration (Tr. 80–84, 88–91).   After holding an evidentiary hearing, Administrative Law Judge (ALJ) Stuart T. Janney denied the application for

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (Doc. 13).

benefits in a decision dated October 5, 2011 (Tr. 17–26).   Sherk's request for review was denied by the Appeals Council, and the October 5, 2011 decision became the final agency decision (Tr. 6).   Sherk has exhausted his administrative remedies and has filed a timely complaint in this Court seeking judicial review of the ALJ's adverse decision.

In his brief (Doc. 19), Sherk raises the following issues:

(1)    The ALJ erred at Step 3 of the sequential inquiry by finding that Sherk's cerebral palsy did not meet a listed impairment;

(2)    The ALJ erred by failing to order a consultative psychological examination;

(3)    The ALJ erred in assessing Sherk's residual functional capacity (RFC) in that he improperly weighed the medical opinions and did not explain how the medical evidence supported his findings,

(4)    The ALJ erred in assessing Sherk's credibility.

## LEGAL STANDARDS

### A.    Disability Standard

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes and federal regulations.   *See* 42 U.S.C. § 423, *et seq*.; 20 C.F.R. pt. 404.   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).   A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities for pay or profit. 20 C.F.R. § 404.1572.

The Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the ALJ determines that the claimant is disabled or not disabled at any step of the five-step inquiry, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520(a)(4).

The first step considers whether the claimant is presently unemployed. 20 C.F.R. § 404.1520(a)(4)(i). A negative answer at step one leads to a determination that a claimant is not disabled and ends the inquiry; an affirmative answer leads to the next step. *Id.* The second step evaluates whether the claimant has an impairment or combination of impairments that is severe, medically determinable, and meets a durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii). A negative answer at step two leads to a determination that a claimant is not disabled and ends the inquiry; an affirmative answer leads to the next step. *Id.* The third step analyzes whether the claimant's severe impairment(s) meet or equal one of the listed impairments acknowledged to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4)(iii). An affirmative answer at step three leads to an automatic determination that a claimant is disabled and ends the inquiry; a negative answer

leads to the next step.   *Id.*

Before continuing to step four, the claimant's residual functional capacity (RFC) is assessed.   20 C.F.R. § 404.1520(a)(4).   The fourth step assesses whether the claimant can perform past relevant work given his or her RFC.   20 C.F.R. § 404.1520(a)(4)(iv).   An affirmative answer at step four leads to a determination that a claimant is not  disabled and ends  the  inquiry; a negative answer leads to the next step.   The fifth and final step assesses whether the claimant can perform other work given his or her RFC, age, education, and work experience.   20 C.F.R. § 404.1520(a)(4)(v).   An affirmative answer at step five leads to a determination that a claimant is not  disabled and the claim is denied.   *Id.*   On the other hand, a negative answer leads to leads to a determination that a claimant is disabled.   *Id.*

**B.    Judicial Review**

The scope of judicial review of the Commissioner's decision is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."   42 U.S.C. § 405(g).   Thus, the Court must determine not whether Mr. Sherk was in fact disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) ("On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported his decision with substantial evidence.")

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but the Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   While judicial review is deferential, it is not abject; the Court does not act as a rubber stamp for the Commissioner.   *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (listing cases).   The ALJ "must provide an accurate and logical bridge between the evidence and her conclusion that a claimant is not disabled."   *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir. 2008)).   "If a decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, a remand is required."   *Kastner*, 697 F.3d at 646 (quoting *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)).

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by Sherk in his complaint.

### A.    Mr. Sherk's Disability Allegations

Jeffrey Sherk submitted a Function Report, a Work History Report, and a memo entitled "Barriers to Employment that Come from Cerebral Palsy" to the Social Security Administration (Tr. 151–53, 186–94, 197–204).   He also testified at an evidentiary hearing in front of ALJ Janney on August 30, 2011 (Tr. 32–78).

The following is a summary of Sherk's allegations regarding his disability as presented on the agency forms and at the evidentiary hearing.

Sherk was born in 1960 and was 48 years old on the alleged onset date—September 4, 2008.   He is five feet, eight inches tall and weighs approximately 175 pounds.   He lives with his wife and their cats.   Sherk earned a Bachelor of Arts in English Literature in 1984 and a Masters in Library Science in 1991.

Sherk was born with cerebral palsy.   It has affected his legs and feet bilaterally, but his right side is worse than his left side.   As a result, his coordination and ambulation are impaired.   The cerebral palsy also negatively impacts his vision and executive brain function.   Additionally, Sherk suffers from depression and anxiety.

Regarding, his coordination and ambulation, Sherk explained that he has "a gait" when he walks because the tendons in his right leg are "so tight that it makes walking clumsy" (Tr. 43).   He used assistive devices like a brace, a walker, and/or a cane when he was little, but he does not use anything now.   Physical fatigue makes his coordination and ambulation worse; he stated, "If I get tired, my coordination goes out the window" (Tr. 47).   He falls a couple times a month.   Some of his falls are because he is tired and dragging his leg and it catches on something.   Other falls are because he stumbles over an object that he never saw.

Sherk also has leg spasms.   At the time of the hearing, he had only been taking medication for the leg spasms for about a month.   He explained that his leg

spasms had grown more pronounced within the last 12 to 18 months, but he did not go see a doctor until they "really started to mess with my sleep" and he was unable to sleep through the night (Tr. 46).

As for his vision, Sherk explained that he has no peripheral vision or depth perception, and he is colorblind.  He also has problems with tunnel vision that make it difficult for him to notice objects not in his direct focus.   Sherk has worn bifocals since approximately age fourteen.   The bifocals do not correct his cerebral palsy-related vision problems, though they do make it possible for him to read. Due to his vision problems, Sherk has never had a driver's license.

Regarding his executive brain function, Sherk has problems with communication.  For example, he has difficulty responding to questions because he needs time to organize his thoughts; otherwise, he tends to ramble without ever answering the specific question that was asked.   His visual memory is also impaired which makes it difficult for him to recognize faces and remember people. He has difficulty grasping spatial relationships and gets lost easily when he is by himself.

As for the depression and anxiety, Sherk indicated that he has a number of symptoms.  He has low self-esteem and is sensitive to criticism.  He becomes frustrated easily.  He lacks energy and he tires more quickly.  And he has difficulty concentrating.

Sherk was previously employed as a records clerk at AmeriCredit in Texas. However, he had to stop working in 2008 because he and his wife had to move to

Illinois to help her father.   Since moving to Illinois, Sherk has looked for work, but he has never been hired.   The first five years that he worked at AmeriCredit he feared that he would be fired because he worked at a slower pace than his colleagues.   He stated that he never reached the company standard and estimated that he did 50% to 60% of what his colleagues did.   Additionally, when he came back to work after taking a vacation for a week, he had to be retrained to do his job. Sherk can only type approximately 30 words per minute and he estimated that it takes him an hour to type a three paragraph email.

When asked about his functional limitations, Sherk indicated that, between walking, standing, and sitting, the most difficult is standing.   The longest he can stand is 30 minutes and then he needs to sit down and take a break for 10 or 15 minutes.   The longest he can sit without changing positions is 20 minutes because his thighs get restless.   He does not carry anything over 10 pounds on an average day, and he does not lift more than three pounds frequently.   If he tries to squat or lift more than 20 pounds, he falls over.

Sherk regularly does household chores.   For example, he packs his wife's lunch, does a couple loads of laundry per week, helps cook meals, and cares for his cats.   In his downtime, he likes to read books and look at books.   He can only read for about 40 minutes before he has to take a break.   Sometimes Sherk walks to the local library.   He does not enjoy walking, but forces himself to do so for his health. The library is one mile from his house, and he has to take a 20-minute break halfway.   He usually stays at the library for about 45 minutes to an hour and then

walks back home.   The whole trip takes him two to two and half hours.

When asked to describe any difficulties with self-care, Sherk indicated that his coordination and ability to move is "significantly impaired" right after he wakes up.   As a result, he does not shave in the morning; instead he waits to do it before bed because he is able to manage it better then.   He also has to sit down on the floor to get dressed because of balance problems.

**B.   Medical Records**

Dr. Daniel Kutzler was Sherk's primary care physician from 1997 to 2008 when Sherk lived in Texas (Tr. 177–78).   Despite the long treatment relationship, there are only four pages of medical records from Dr. Kutzler—two pages of notes and two pages of laboratory results (Tr. 249–52).   In January 2008, Sherk saw Dr. Kutzler for a general physical exam.   Sherk had no major changes in his health and Dr. Kutzler's impression was a "stable general examination" (Tr. 249).   Notably, Dr. Kutzler indicated that Sherk's left leg was mildly atrophied, which he found to be "consistent with his cerebral palsy" (Tr. 249).

In March 2008, Sherk saw Dr. Kutzler and complained that he had injured his left leg walking stairs at work.   Dr. Kutzler noted that Sherk "had cerebral palsy through the years and is relatively weak and stiff on his right side" (Tr. 250). Dr. Kutzler further noted that Sherk "ambulates with the usual gait abnormalities secondary to cerebral palsy" (Tr. 250).   On physical examination, Dr. Kutzler observed that Sherk "[was] a little bit atrophic on the right leg," he had "very tight hamstrings" in both legs, and he was "only able to elevate his legs about 30 degrees

off the exam table" (Tr. 250).

After moving to Illinois, in 2008, Sherk began seeing Dr. Michelle Jenkins at the REA Clinic in Christopher, Illinois.  His had a new patient visit with her in November 2008 (Tr. 240).   At that time, Dr. Jenkins noted that Sherk's "problem list" included cerebral palsy, no depth perception, duodenal ulcers, and one other ailment that is illegible (Tr. 236).   Sherk saw Dr. Jenkins on various occasions through the next couple years for a number of reasons, such as shoulder pain, plantar fasciitis, cold and flu, cholesterol, and medication changes (Tr. 237–239, 283).    A paper titled "Patient Plan" indicates that Sherk visited Dr. Jenkins in July 2011 for restless legs and weakness, and she prescribed Requip (Tr. 348). There is no progress note or other records from this visit.

As for mental health treatment, Sherk indicated that he saw Dr. Paul Warren in Texas in 2006 due to "suicidal ideation" (Tr. 179).   There are no records from Dr. Warren.   In July 2010, Sherk began seeing Auna Searcy, an advanced practice nurse who specializes in psychiatry, at Southern Illinois Psychiatry, LLC (Tr. 279–80).   He was diagnosed with major depressive disorder and prescribed 10 mg of Celexa (Tr. 280).   The next month, the dosage was increased to 40 mg (Tr. 297). Sherk saw Nurse Searcy a total of six times over a 10-month span for medication and counseling (Tr. 279–80, 288–97).

Dr. Jenkins and Nurse Searcy both submitted Medical Source Statements which are detailed below in Section E.

**C.    Consultative Examination**

There was no physical or mental consultative examination performed.

**D.      State Agency Assessments**

In May 2010, Howard Tin, PsyD, completed a Psychiatric Review Technique form (Tr. 253–65).   This assessment was based on a review of medical records and not a personal examination.   Dr. Tin indicated that Sherk had alleged he was suffering from "Executive Control Problems" (Tr. 254).   Dr. Tin opined that this impairment was not severe and did not meet Listing 12.02 for Organic Mental Disorder (Tr. 253, 254).   Dr. Tin also indicated that Sherk had a coexisting nonmental impairment[2] that required referral to another medical specialty (Tr. 253).   Dr. Tin did not complete a Mental RFC Assessment.

In May 2010, Dr. Clement Gotway, a state agency physician, completed a physical RFC assessment (Tr. 267–74).   This assessment was also based on a review of medical records and not a personal examination.   Dr. Gotway opined that Sherk could occasionally lift or carry 20 pounds, he could frequently lift or carry 10 pounds, and he could sit for about 6 hours in an 8-hour workday.   Dr. Gotway further opined that due to cerebral palsy, Sherk "was limited in standing/walking at least two hours a day" and his ability to push and pull in his lower extremities was limited (Tr. 268).   Dr. Gotway opined that Sherk also had postural limitations due to the cerebral palsy.   In particular, Sherk could occasionally climb ramps and stairs, balance, stop, kneel, crouch, and crawl, but could never climb ladders, rope, or scaffolds (Tr. 269).   Dr. Gotway indicated that

---

[2]  The Court presumes that Dr. Tin was referring to Sherk's cerebral palsy.

Sherk should also avoid working around unprotected hazards, including heights, dangerous machinery, and heavy equipment, "due to his lack of agility and inability to move quickly to avoid an accident" (Tr. 271).

**E.   Medical Source Statements**

Dr. Michelle Jenkins completed a form that was similar to the physical RFC assessment form used by the state agency physician (Tr. 349–54).   The form was dated July 26, 2011.   Dr. Jenkins opined that Sherk could continuously lift up to 10 pounds, could occasionally lift between 11 and 50 pounds, but could never lift over 51 pounds.   Dr. Jenkins further opined that Sherk could occasionally carry up to 10 pounds, but never anything heavier.   Regarding his ability to sit, Dr. Jenkins indicated that he could sit for 6 hours in an 8-hour workday, but only for 20 minutes at a time because his "legs get irritated/"jumpy" [with] sitting longer" (Tr. 350).   Dr. Jenkins indicated that Sherk could stand for one hour in an 8-hour workday, but only for 30 minutes at a time.   Finally, she indicated that Sherk can walk for less than one hour in an 8-hour workday, and only for 20 minutes at a time.   Dr. Jenkins also indicated that Sherk needed to make frequent position changes from sitting, to standing, to laying down due to "upper back tightness/spasticity" (Tr. 350).

Auna Searcy, APN, completed a form that was essentially a mental RFC assessment (Tr. 356–57).   The form was dated August 23, 2011.   Nurse Searcy opined that Sherk was slightly restricted in his ability to understand and remember short, simple instructions, and moderately restricted in his ability to understand,

remember, and carry out detailed instructions (Tr. 356).   She indicated that her opinion was based on clinical findings of Sherk consistent with major depressive disorder, including increased sleep, low self-esteen, anhedonia,[3] being easily overwhelmed, and feelings of helplessness, hopelessness, and worthlessness (Tr. 356).   Nurse Searcy further opined that Sherk was slightly restricted in his ability to interact appropriately with the public; moderately restricted in his ability to interact appropriately with supervisors and co-workers; and markedly restricted in his ability to respond appropriately to work pressures and changes in a routine work setting (Tr. 357).   She indicated that this opinion was based on a clinical evaluation of Sherk done by a psychotherapist and an APN which showed a moderate amount of stress caused Sherk to shut down (Tr. 357).   She also indicated that Sherk "has concerns if he can do a job" (Tr. 357).

F.     **Vocational Expert's Testimony**

Following Sherk's testimony at the evidentiary hearing on August 30, 2011, a vocational expert (VE) testified.   The ALJ asked the VE a series of hypothetical questions.   The first two questions are not particularly relevant here.   The third question required the VE to assume a person who could perform sedentary work, meaning the person can lift, carry, push, and pull 10 pounds occasionally and less than 10 pounds frequently; can sit six of eight hours; and can stand and/or walk for two of eight hours.   The ALJ also imposed the following additional limitations:

---

[3] Anhedonia is defined as the "total loss of feeling of pleasure in acts that normally give pleasure." DORLAND'S MEDICAL DICTIONARY 91 (32nd ed. 2012).

- Cannot ever operate foot controls;
- Cannot perform tasks that require distinguishing between colors;
- Cannot see very small or fine print, but can see normal print like that found in a newspaper or book;
- Can occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds;
- Can occasionally balance, stoop, kneel, crouch, and crawl;
- Should avoid even moderate exposure to hazards such as unprotected heights or dangerous and moving machinery;
- Should avoid concentrated exposure to ordinary hazards such as boxes on the floor, open doors, or oncoming cars; and
- Should avoid concentrated exposure to extreme heat.

(Tr. 71).   The VE testified that this hypothetical person could perform his past job as a data entry clerk.

For the fourth question, the ALJ asked the VE to assume the same hypothetical person with an additional "executive compromise" (Tr. 72). Specifically, the hypothetical person had a moderate degree of difficulty maintaining sustained pace.   The hypothetical person also had "visual deficits, with respect to accommodation or hand-eye coordination, depth perception" (Tr. 72).   Taken together, those limitations meant that the hypothetical person could only do 50 to 60 percent as much as other workers.   The VE testified that with those additional limitations, the hypothetical person would be precluded from his past work, as well as, all other work.   Additionally, the hypothetical person would be precluded from all work if he had to be re-trained to do previously learned tasks about once a month (Tr. 75).

## THE DECISION OF THE ALJ

ALJ Janney denied Jeffrey Sherk's claim on October 5, 2011 in a written

decision (Tr.17–26).   The ALJ followed the five-step analytical framework outlined in the federal regulations.   At step one, the ALJ determined that Sherk had not engaged in substantial gainful activity since the alleged onset date of September 4, 2008.   The ALJ also found that Sherk is insured for DIB through December 31, 2013.   At step two, the ALJ found that Sherk had the severe impairment of cerebral palsy and the non-severe impairments of GERD or gastritis, duodenal ulcers, and a small calcaneal spur of the right foot.   The ALJ rejected Sherk's claims of the severe impairments of "executive brain function compromise," restless leg syndrome, and major depressive disorder.   At step three, the ALJ determined that Sherk's impairments did not meet or equal a listed impairment.

At step four, the ALJ concluded that Sherk had the residual functional capacity to perform work at the sedentary exertional level, with some additional limitations.   The ALJ then concluded, based on the testimony of a vocational expert, that Sherk could do his past work as a data entry clerk.   As a result, Sherk was not disabled.

## ANALYSIS

Sherk argues that the ALJ's decision is flawed for a number of reasons.   *See supra* p. 2.   The Court has carefully reviewed each of Sherk's arguments and the Commissioner's responses.   As further explained below, the Court agrees with Sherk's first and second arguments and finds that the ALJ erred by finding that Sherk's cerebral palsy did not meet a listed impairment and by not ordering a consultative psychological examination.   Because of these errors, the case must be

remanded so that the record can be more fully developed at steps two and three. In light of that conclusion, the Court declines to reach the other issues raised by Sherk, including whether the RFC determination was flawed and whether the ALJ properly assessed Sherk's credibility.   Without a full development of the record at steps two and three, the Court cannot find that the ALJ's formation of Sherk's RFC, and   his ultimate decision to deny benefits are   supported   by   substantial evidence on the record as a whole.   Both of these issues should be re-assessed based on the record developed on remand.

## A.   Whether the ALJ Should Have Ordered a Mental Consultative Examination

At step two, the ALJ concluded that Sherk's major depressive disorder was not a medically determinable impairment because Sherk was diagnosed by an advanced practice nurse who was not an acceptable medical source (Tr. 20). Sherk argues that the ALJ erred by not ordering a psychological consultative examination to determine whether his depression was a medically determinable impairment (Doc. 19).   According to Sherk, this omission violated the ALJ's duty to adequately develop the record in order to permit a proper assessment of his claims.   The Court agrees with Sherk.

"While a claimant bears the burden of proving disability, the ALJ in a Social Security hearing has a duty to develop a full and fair record."   *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009).   If the evidence from a claimant's medical source is insufficient to permit the ALJ to make an informed decision, the ALJ can order a

consultative examination.   *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007); 20 C.F.R. §§ 404.1517 and 404.1519a.   However, whether additional tests or examinations are needed is normally a question of judgment, and Courts generally defer to the ALJ's reasoned judgment on whether the record has been adequately developed.   *Wilcox v. Astrue*, 492 F. App'x 674, 678 (7th Cir. 2012); *Skinner*, 478 F.3d at 844 ("This court generally upholds the reasoned judgment of the Commissioner on how much evidence to gather.")   "Particularly in counseled cases, the burden is on the claimant to introduce some objective evidence indicating that further development is required."   *Wilcox*, 492 F. App'x at 678 (citing *Nelms*, 553 F.3d at 1098); *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) ("[T]he claimant has the burden to make sure there is, in the record, evidence sufficient to suggest a reasonable possibility that a severe impairment exists.   If she does so, then the ALJ's duty to order a consultative examination arises.") (citing *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997)); *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) ("A consultative evaluation becomes "necessary" only when the claimant presents evidence sufficient to raise a suspicion concerning a non-exertional impairment.")

Here, Sherk indicated on the Disability Report Appeal filed with the Social Security Administration that depression was a new condition that limited his ability to work (Tr. 214–15).   He presented evidence that he was receiving mental health treatment from Auna Searcy, an advanced practice nurse who specialized in psychiatry, and Sallie Schramm, a Licensed Clinical Professional Counselor who

holds a Masters Degree in Counseling Psychology, at Southern Illinois Psychiatry, LLC (Tr. 215, 279–80, 288–97).   Sherk saw Nurse Searcy on six occasions over the course of ten months.   She diagnosed him with major depressive disorder based on clinical evaluations and findings (Tr. 280).   She also opined that his depression limited his ability to understand, remember, and carry out instructions, as well as, his ability to respond appropriately to supervisors, co-workers, and work pressures in a work setting (Tr. 356, 357).   Sherk also presented evidence that he was prescribed an antidepressant, and his dosage was later increased (Tr. 279–80, 288–97).

The ALJ acknowledged Nurse Searcy's diagnosis, but explained that an advanced practice nurse is not an acceptable medical source and therefore her opinion was insufficient to establish the existence of a medically determinable impairment.[4]   Rather than making an effort to further investigate, the ALJ simply dismissed Sherk's depression as a "non-medically determinable impairment" (Tr. 20–21).   This was plainly insufficient to satisfy his duty to develop the record in light of the medical evidence presented by Sherk which suggested a reasonable possibility of a severe medically determinable impairment.   *Contra Flaherty*, 515

---

[4] The Commissioner requires evidence from an "acceptable medical source" to establish that a claimant has a "medically determinable impairment."   20 C.F.R. § 404.1513(a).   Acceptable medical sources include licensed physicians and licensed or certified psychologists.   *Id.*   An APN is not an "acceptable medical source," but is considered an "other medical source" under § 404.1513(d)(1).   "Other medical sources" may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *See* 20 C.F.R. § 404.1513(d)(1).   They cannot, however, establish the existence of a medically determinable impairment.

F.3d at 1071 ("Isolated and unsupported comments by the claimant are insufficient, by themselves, to raise the suspicion of the existence of a nonexertional impairment." (quoting *Hawkins*, 113 F.3d at 1167)).

The Commissioner argues that Sherk is "attempt[ing] to foist his evidentiary burden on the ALJ" (Tr. 10–11).  This argument misrepresents the facts of this case.  Sherk supplied substantial evidence showing that he was diagnosed with a mental health impairment and was under the care of a mental health professional at a facility specializing in mental health treatment.  However, according to the federal regulations, it was from the "wrong" type of medical professional.  The Court refuses to find that Sherk should have known that Nurse Searcy was not an "acceptable medical source" under the federal regulations and that he needed to seek evaluation and treatment from a licensed or certified psychologist.  Simply put, Sherk met his burden to set forth evidence of his mental health impairment, but that evidence was insufficient based on a technicality in the federal regulations.  The ALJ could not simply disregard Sherk's evidence; instead, the ALJ now had the burden to further develop the record as needed to determine if Sherk was disabled.

The Commissioner also defends the ALJ's decision by noting the ALJ made an alternate finding that Sherk's depression, even if medically determinable, was not severe because it "does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities" (Doc. 25, p. 11–12; Tr. 20–21).  The Commissioner claims the ALJ's conclusion is supported by the Psychiatric Review Technique completed by state agency psychologist Howard Tin

(Doc. 25, p. 11).   The ALJ did not ever mention the Psychiatric Review Technique, and the Commissioner is fully aware that Court can only look at reasons given by the ALJ.   *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir, 2012) ("Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace.")   Furthermore, even if the ALJ had cited to the Psychiatric Review Technique in support of his conclusion, he had a duty to explain why it overcame the opinion of Nurse Searcy.   *See* Social Security Ruling 06-03P, 2006 WL 2329939, at * (Aug. 9, 2006) (explaining that adjudicators should consider the factors in 20 C.F.R. 404.1527(d) in weighing opinions from "other medical sources," and that opinions from "other medical sources" may outweigh opinions from "acceptable medical sources").   In other words, the ALJ's one-sentence finding that Sherk's depression was not severe is not supported by substantial evidence and is so poorly articulated that the Court is precluded from meaningfully reviewing the ALJ's conclusion.

In conclusion, this case must be remanded to the ALJ to fully develop the record as to whether Sherk's depression was a severe medical impairment.   On remand, the ALJ should ensure that an evaluation of Sherk has been completed by or with the assistance of a licensed or certified psychologist and includes an assessment of any and all work-related limitations caused by Sherk's mental health impairment.   If necessary, the ALJ should order a psychiatric consultative examination.

**B.     Whether Sherk Met the Listing for Cerebral Palsy**

At step three, the ALJ recognized that Sherk's cerebral palsy constituted a severe impairment, but ultimately concluded that Sherk did not meet the requirements of any subsection in Listing 11.07 for cerebral palsy.   Sherk argues that this conclusion was an error and ALJ did not properly analyze whether his cerebral palsy satisfied the requirements of Listing 11.07D.   The Court agrees with Sherk.

Under a theory of presumptive disability, a claimant is eligible for benefits if he or she has an impairment that meets or equals one of the Social Security Administration's listed impairments.   20 C.F.R. § 404.1520(d);  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The claimant bears the burden of showing that his or her impairment meets a listing and all criteria of the listing are satisfied.   *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); 20 C.F.R. § 404.1525(c)(3).

To satisfy Listing 11.07D for cerebral palsy, the claimant must provide evidence that he has cerebral palsy[5] and **disorganization of motor function as described in section 11.04B and 11.00C**.   20 C.F.R., Pt. 404, Subpt. P, App. 1, 11.07.   Disorganization of motor function is described as "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)."   *Id.* at 11.04B.   Section 11.00C further explains that "persistent

---

[5] Cerebral palsy is a group of persistent, nonprogressive motor disorders that result from brain damage before, during, or after birth.   DORLAND'S MEDICAL DICTIONARY 1365 (32nd ed. 2012). Cerebral palsy is characterized by delayed or abnormal motor development, such as spasticity (which means excessive tightening of the muscles) in the lower limbs, all four limbs, or on one side of the body, and is often accompanied by mental retardation, seizures, or ataxia.   *Id.* at 1365, 1741.

disorganization of motor function" can present itself "in the form of paresis[6] or paralysis, tremor or other involuntary movements, [or] ataxia [7] and sensory disturbances" and that "[t]he assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms." *Id.* at 11.00C.[8]   Put differently, the question relevant to the instant matter is whether Sherk had ataxia and sensory disturbances that resulted in significant and persistent interference with his manner of walking.

In his discussion at Step 3, the ALJ found that Sherk did not satisfy Listing 11.07D because the "record is devoid of sufficient evidence of . . . disorganization of motor function as described in 11.04B" (Tr. 21).   The ALJ explained that "[a]lthough the claimant reported and testified as to experiencing a 'loss of balance,' the claimant additionally testified that he does not require an assistive device to ambulate" and "there is insufficient evidence as to the claimant experiencing interference with . . . his locomotion . . ." (Tr. 21).

First and foremost, it is simply incorrect to say that the record contained insufficient evidence of interference with locomotion.   As Sherk pointed out, he

---

[6] Paresis is defined as "slight or incomplete paralysis."   DORLAND'S MEDICAL DICTIONARY 1383 (32nd ed. 2012).

[7] Ataxia is defined as "failure of muscular coordination; irregularity of muscular action." DORLAND'S MEDICAL DICTIONARY 170 (32nd ed. 2012).

[8] Section 11.00C reads in its entirety: "*Persistent disorganization of motor function* in the form of paresis or paralysis, tremor or other involuntary movements, ataxia[8] and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms."   20 C.F.R., Pt. 404, Subpt. P, App. 1, 11.00C.

testified that the tendons in his legs are so tight that "it makes walking clumsy" (Tr. 43).   His former physician, Dr. Kutzler, noted that Sherk walked "with the usual gait abnormalities secondary to cerebral palsy" (Tr. 250).   His current physician, Dr. Jenkins, noted that Sherk had a "gait with limp classic for [cerebral palsy]" (Tr. 250).   Finally, the interviewer at the Disability Field Office noted that Sherk "cannot walk straight due to his crippling [sic] legs from the cerebral palsy" (Tr. 156).

Therefore, based on the evidence, it appears to the Court that Sherk undoubtedly suffers from an interference with locomotion due to his cerebral palsy. The issue the ALJ needed to address was whether the degree of interference is "significant."   The only thing in the ALJ's analysis at Step 3 that could be considered relevant to that issue is the ALJ's remark that Sherk "does not require an assistive device to ambulate" (Tr. 21).   However, the Court cannot see how the simple fact that Sherk is able to walk without an assistance device conclusively establishes that the interference with locomotion is not significant.   Sections 11.04B and 11.00C do not require that a claimant prove he or she is unable to ambulate without an assistive device.   In fact, neither of those sections even mentions assistive devices.   Because the ALJ's decision is devoid of any explanation on this matter, the ALJ failed to build the requisite "accurate and logical bridge" between the evidence and his conclusion that Sherk did not suffer from significant interference with locomotion.   *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) ("We require that an ALJ build an 'accurate and logical bridge

from the evidence to [his] conclusion' so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review.")

Furthermore, the Court's own review of the record reveals there is evidence in the record that supports Sherk's claim of significant interference with locomotion.   In particular, Sherk testified that he falls a couple times a month while walking (Tr. 47).   He also testified that it takes him *hours* to do daily chores, cook meals, or go shopping (Tr. 188, 189).   Dr. Jenkins opined that Sherk was not able to walk a block at a reasonable pace on rough or uneven surfaces (Tr. 354). She further opined that he was not able to climb a few steps at a reasonable pace with the use of a single hand rail (Tr. 354).   While the ALJ does not have to address every piece of evidence in the record, the ALJ must evaluate evidence that supported Sherk's position to give the reviewing court confidence that he thoroughly considered the record why evidence which appears to favor Sherk was overcome by the fact that Sherk does not use an assistive device while walking. *Ribaudo v. Barnhart,* 458 F.3d 580, 584 (7th Cir. 2006); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) ("Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and  explain why it was rejected."); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (criticizing ALJ's failure to discuss conflicting evidence at Step 3 inquiry including the strongest piece of evidence supporting claimant's case).

The Commissioner defends the ALJ's decision by arguing that the ALJ's decision should be read as a whole and other sections of the decision are relevant to his conclusion at step three.   Specifically, the Commissioner claims that at step four the ALJ "discusses other evidence that supports his step three finding, including Plaintiff's mile-long walks" (Doc.25, p. 9).   However, contrary to the Commisioner's assertion, there is no "discussion" at step four.   There is only the ALJ's remark that Sherk testified "he walks to a local library that is one mile away, but he has to take a break halfway there" (Tr. 23).   The ALJ gave no indication that he intended for this remark to address whether Sherk met Listing 11.07D.   Even if the ALJ did so intend, merely reciting Sherk's testimony hardly constitutes an adequate analysis of the issue.   Finally, the Court is not convinced this evidence cuts against Sherk; based on his testimony, it takes him at least an hour, if not more, to walk the two-mile round trip to between the library and his house, and he has to stop and rest halfway through each leg of the trip.[9]   That testimony, if credited, supports a finding that although Sherk is able to walk, he does so at an extremely slow, laborious pace.

In conclusion, the ALJ's failure to provide an adequate explanation and to

---

[9] Sherk testified that walking to the library and back takes him 2 or 2.5 hours total, given the time he spends in the library and the breaks he takes while walking (Tr. 66).   He also testified that he spends anywhere from 45 minutes to an hour in the library (Tr. 51).   Therefore, it can be extrapolated from Sherk's testimony that it takes him anywhere from an hour to just under two hours to walk the 2 mile round-trip.   Specifically, the fastest possible scenario given Sherk's testimony is if the whole trip took him 2 hours and he spent 1 hour at the library, then he spent one hour walking to and from the library.   The slowest possible scenario given Sherk's testimony is if the whole trip took him 2.5 hours and he spent 45 minutes at the library, then he spent 1.75 hours walking to and from the library.

address particularly critical evidence precludes the Court from meaningfully reviewing his conclusion that Sherk did not meet the requirements of Listing 11.07D.  For these reasons, the case must be remanded to the ALJ to conduct a more thorough analysis of the evidence at step three.

<u>CONCLUSION</u>

Because of the errors in the ALJ's decision, this case must be remanded. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Sherk is disabled or that he should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

The Commissioner's final decision denying Jeffrey L. Sherk's application for social security disability benefits and supplemental security income is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of Plaintiff Jeffrey Sherk.

**IT IS SO ORDERED.**

**DATE:   May 27, 2014**

**s/ Clifford J. Proud____**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**